IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 7, 2021

**STATE OF TENNESSEE v. ROBERT BROOKS**

**Appeal from the Criminal Court for Shelby County**
No. 17-01422        Chris Craft, Judge

_____

**No. W2020-01026-CCA-R3-CD**
_____

Defendant, Robert Brooks, was convicted of reckless endangerment, aggravated robbery, two counts of aggravated assault, and one count of assault. The trial court imposed a sentence of eleven months and twenty-nine days for reckless endangerment to be served consecutively to Defendant's effective ten-year sentence for aggravated robbery, two counts of aggravated assault, and assault. On appeal, Defendant argues that the evidence was insufficient to support his conviction for aggravated robbery and that the trial court erred by denying his peremptory challenge to strike Juror 7. Following our review of the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, J.J., joined.

Anne Tipton, Memphis, Tennessee (at trial), and Claiborne Ferguson, Memphis, Tennessee (at trial and on appeal) for the appellant, Robert Brooks.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises from a transaction between Defendant and Jeremiah Crotwell for the purchase of an automobile that Mr. Crotwell had listed for sale on Craigslist. Defendant became angry when the car would not start after the transaction was complete, and Mr. Crotwell refused to refund the money Defendant had paid for the vehicle. Defendant shot at Mr. Crotwell as he attempted to leave in a vehicle with Xiomara Carmona and Jasmine Stewart, striking Mr. Crotwell in the back of his shoulder. Defendant then took Ms. Carmona's car at gunpoint, later abandoning it behind a convenience store. A Shelby County grand jury indicted Defendant for attempted second-degree murder, aggravated robbery, three counts of aggravated assault, and employing a firearm during the commission of a dangerous felony.

*Voir Dire*

During voir dire, after seven rounds of peremptory challenges, the State raised a *Batson* challenge arguing that every prospective juror who was Caucasian had been excused by defense counsel. At that point, the trial court said:

> All right. Regarding Batson and I'll say this I have been noticing as these challenges have been filed that all of the Caucasian or white jurors have been disappearing. And the only person left was [Juror 7[1]]. The only white juror in the top two rows.

The trial court further pointed out that it was not surprised by the *Batson* challenge noting that Juror 1, a Caucasian female, was excused during the first round of peremptory challenges along with Juror 2, an Asian-American man, and Juror 3, an African-American man. In the second round of challenges, defense counsel excused Juror 4, a Caucasian man with a slight European accent. In the following round, another Caucasian male, Juror 5, was excused. In the sixth round, defense counsel excused Juror 6, a Caucasian female. Finally, in the seventh round, defense counsel excused Juror 7, a Caucasian male. The trial court noted that all of the Caucasian potential jurors had been excused by defense counsel and found that there was enough of a pattern in the peremptory challenges to continue the inquiry into the State's *Batson* challenge.

Concerning the racially neutral reason for excusing Juror 7, defense counsel said:

> I listed that [Juror 7] is a mechanic with farm equipment I believe it is. His wife works on warranty for equipment. I did not find him terribly attentive to my questions or responsive to those. Therefore, I do not feel he would be a proper juror in this case.

---

[1] For privacy reasons, we will refer to the jurors in this case by number rather than using their names.

In response, the State argued that Juror 7 had raised his hand, laughed at defense counsel's jokes, and was very attentive. The trial court agreed that Juror 7 had "enjoy[ed] [defense counsel's] humor." The State further argued:

> [Juror 7] volunteers every single thing that [defense counsel] says. And he just - - I mean, and every other single white person that has been excluded in this case was paying attention as well.
>
> And I'm not saying that that's a pattern or that's necessarily why [defense counsel] is going there. But we're gonna have a jury of all black folks. And that's not necessarily a representation of our community and of our jurors. And I asked the Court to grant the Batson challenge and let [Juror 7] get up there and remain up there. There are jurors that are up there that are African-American that have worse reasons to be excused and she has not challenged any of them. For example[,] the woman that told us that she had a murdered son. She's still in there. But [Juror 7] was the farm equipment individual. And not only the farm equipment person, but his wife works in the warranty business. He has one son whose 27-year[s]-old. I mean, I don't understand - -
>
> • • •
>
> [. . . ]I don't understand why - - at what point [Juror 7] is not making any - - now not paying attention. It just looks like a pattern to get an all black jury and that's what the State is opposing.

Defense counsel noted that she did not intentionally attempt to exclude all Caucasian jurors. She said: "It's just in selecting it I don't think that [Juror 7] would be a favorable jury to the defense and to the theories that we're going to argue. And based on that I have in conjunction with my client have asked to have him excused."

The trial court did not find any reason that Juror 7 needed to be excused other than Defendant not wanting the juror on the jury because he was Caucasian. The court also noted that defense counsel had consulted with Defendant concerning the jurors. The trial court said:

> So, that's the problem I have. I just don't see a reason - - and let me say this. It's not - - I spent several years as a defense lawyer as well as a prosecutor. I just don't see a reason that [Juror 7] needs to be excused other than maybe the Defendant wants him excused because he's white. I just can't see that he was not attentive.

- 3 -

I think he responded just as well as the other jurors to that. And I may be giving you something to appeal on, which is fine, but at this point I don't see allowing a challenge because of *Batson*, [Juror 7] is the only Caucasian juror in the jury. And I've been watching them disappear round after round. And I just feel that that's not proper.

And I'm not saying that it's all [defense counsel's] fault - -

Concerning the jurors who had been excluded, defense counsel told the trial court that Juror 1, who was a Caucasian female, "was terribly uninterested and generally just disconnected from this process." She noted that Juror 1's employment at a staffing firm that "generally does warehousing" was concerning as well. Defense counsel pointed out that she was concerned about Juror 2, an Asian-American male, because he had been the victim of a car burglary four years earlier. She said that Juror 3, an African-American male, was concerning to her due to his employment and responses to the questions. Defense counsel told the trial court that Juror 4, who seemed to be of Slavic descent, was not paying attention and was staring into space. She was concerned about Juror 5, a white male, because he lived a couple of blocks away from where the crime occurred. Defense counsel was concerned about Juror 6, a white female, because counsel did not think that she seemed interested, and she did not actively participate in questions asked by the State or defense counsel.

The trial court noted its opinion and understanding was that trial counsel was "working with her client that he may very well want an all African-American jury. And he's giving input into this." However, the trial court felt that "there is not a racially neutral reason for the Defendant to want to get rid of [Juror 7] that I can see at this point."

*Trial*

On January 25, 2017, at approximately 11:00 a.m. to 12:00 p.m., Jeremiah Crotwell met with Defendant who responded to an ad that Mr. Crotwell had placed on Craigslist concerning a 1992 Chevrolet Cavalier that Mr. Crotwell wanted to sell. The two men met at Defendant's home on Blue Ridge Road in the Bartlett area, and Defendant took the car for a test drive with Mr. Crotwell as a passenger. Mr. Crotwell testified that he was unaware of any problems with the vehicle, other than a "loose battery that [Mr. Crotwell] had to deal with a couple of times." During the test-drive, Defendant drove the car to a Kroger gas station to put gas in the vehicle and for him and Mr. Crotwell to conduct the transaction for the sale of the vehicle. Mr. Crotwell testified that Defendant gave him cash, although Mr. Crotwell could not remember the exact amount, and Mr. Crotwell signed the title to the vehicle over to Defendant.

Mr. Crotwell testified that the vehicle would not start while at the gas pumps. He said, "We pushed it - - we got it started and turned it off and we couldn't get it cranked up again." Mr. Crotwell testified that he assisted Defendant with trying to restart the vehicle for approximately thirty to forty minutes. Mr. Crotwell then called his friend, Jasmine Stewart, who lived nearby, to pick him up. Ms. Stewart and her mother, Xiomara Carmona, later arrived in a white Toyota Solara. When Mr. Crotwell attempted to get into the car, Defendant became agitated, and Mr. Crotwell told him, "[L]ook all sales are final. You already - - everything is already done." Mr. Crotwell testified that Defendant "then pulled out a pistol and said, 'No, it's not.'" He said that Defendant ordered Ms. Stewart and Ms. Carmona out of the Solara but told them to leave the keys in the ignition. Defendant also demanded the money that he had paid to Mr. Crotwell for the Cavalier to be returned to him. Mr. Crotwell testified that when he refused to return the money, Defendant began firing the weapon at Mr. Crotwell's feet. At that point, something ricocheted hitting Mr. Crotwell in the stomach and causing a bruise. Mr. Crotwell turned around and attempted to run into a nearby Applebee's, and Defendant shot him in the back of his right shoulder. He recalled hearing a total of three shots. Mr. Crotwell got inside the restaurant and yelled for someone to call 9-1-1. A nurse who was dining inside Applebee's tended to him until an ambulance arrived. He later spoke to law enforcement and gave them Defendant's description. Mr. Crotwell again spoke with law enforcement after arriving at the hospital. He was later shown a photographic lineup during an interview at the police department, and he identified Defendant from the lineup. He noted that Defendant had a tear drop tattoo on his cheek.

At trial, Mr. Crotwell identified a photograph of Ms. Stewart's white Solara depicting two bullet holes in the passenger door where Mr. Crotwell had been standing at the time of the shooting. A photograph of the gunshot wound to Mr. Crotwell's shoulder and surveillance video that captured the sale of the vehicle and showed Defendant and Mr. Crotwell pushing the Cavalier when it would not start were also introduced at trial. Surveillance video from a nearby FedEx store captured the two men looking under the hood of the Cavalier. The FedEx video also showed Ms. Stewart and Ms. Carmona driving through the parking lot.

On cross-examination, Mr. Crotwell testified that he thought the value of the Cavalier was $600 to $800 although he could not recall the exact price that he listed on the Craigslist ad. He admitted that he wrote a "sale price" of $100 on the back of the car title that he signed over to Defendant and that the ad did not state that "all sales are final." Mr. Crotwell agreed that in addition to the loose battery cable, the car also had an exhaust leak. He did not tell Defendant that the vehicle had a loose battery cable, but he informed Defendant that there was a minor exhaust leak. Mr. Crotwell testified that he had originally planned for Defendant to drive him home after the sale, but once he realized the car was not going to start, he called Ms. Stewart to pick him up because he had to work later that day. Mr. Crotwell acknowledged that his mother's name was actually on the title to the

vehicle, and Mr. Crotwell signed his own name on the back of the title. He did not recall whether Defendant questioned both names being on the title.

Mr. Crotwell testified that he was certain that he heard a total of three gunshots at the time Defendant shot him. He agreed that he had testified at a previous hearing that he heard two gunshots. He said that he must have "misspoke or misremembered."

On redirect examination, Mr. Crotwell testified that he remained at the hospital for approximately five hours after being transported there. He said that he attended physical therapy twice a week, and he cannot lift anything over fifty pounds with his right arm. Mr. Crotwell further testified, "And I have constant pain. If I sleep on it or anything like that it's unusable." He said that he had a bruise in his pelvic area after the shooting.

Xiomara Carmona testified that her daughter, Jasmine Stewart, and Mr. Crotwell had been friends since high school. On January 25, 2017, Mr. Crotwell called at approximately 12:00 p.m. and asked Ms. Stewart to pick him up at Stage Road and Bartlett Boulevard. Ms. Carmona drove her and Ms. Stewart to the area in their shared 2001 Toyota Solara that Ms. Carmona had paid $2,500 for three months prior. Ms. Carmona saw Mr. Crotwell and Defendant standing beside a car with the hood raised. She thought that Defendant was having car trouble, so she parked in front of the car. Mr. Crotwell told Ms. Carmona and Ms. Stewart to wait a few seconds, and he then walked toward them. Ms. Carmona testified that Defendant followed Mr. Crotwell as he was getting into her vehicle and asked for "the money." Mr. Crotwell refused to return the money to Defendant, and Defendant pulled out a gun. Ms. Carmona testified that she told Mr. Crotwell to give Defendant the money, but he refused because he and Defendant had "made a deal." She said that Mr. Crotwell got out of her car, and Defendant pointed his gun at her and Ms. Stewart and ordered them to get out of the car as well but to leave the keys in the vehicle. Ms. Carmona noted that Defendant pointed the gun very close to Ms. Stewart's head.

Ms. Carmona testified that she heard a gunshot after exiting her car, and she ran to a nearby FedEx store. She heard a total of three gunshots. Ms. Carmona testified that a FedEx employee locked the door after she ran inside, and Ms. Stewart eventually arrived at the store and told her that Mr. Crotwell had been shot. Ms. Carmona testified that she did not see her car again until approximately two months later. She said that there were bullet holes in the passenger door, and the inside was full of water because the sunroof had been left open. Ms. Carmona gave a statement to police, but she was unable to identify Defendant from a photographic lineup. She testified that Defendant did not have permission to take her car.

Jasmine Stewart's testimony at trial was similar to that of Ms. Carmona. She testified that she spoke with police after the shooting and identified Defendant from a photographic lineup as the shooter. She noted that Defendant had a tattoo under his eye that was not visible in the lineup photograph. Ms. Stewart did not recall Defendant pointing

the gun at her prior to the shooting. She only saw him point it at Mr. Crotwell. On cross-examination, Ms. Stewart testified that she recalled Mr. Crotwell say "no refunds" as he was getting into the car with her and Ms. Carmona. At that point, Defendant said something, and Mr. Crotwell got back out of the vehicle. Ms. Stewart then noticed that Defendant had a gun. She ran to Applebee's when Defendant began shooting. Mr. Crotwell arrived at the restaurant shortly thereafter.

Coleman Holloway testified that on January 25, 2017, he was eating lunch with a friend at the Applebee's located at Bartlett Boulevard and Stage Road. He said that at approximately 12:00 p.m., a man ran into the restaurant and exclaimed that he had been shot, and the man asked for someone to call police. Mr. Holloway immediately called 9-1-1. As he was later leaving the restaurant, Mr. Holloway noticed a bullet hole in the passenger-side rear door of his rental truck which had been parked in the "fourth spot from the to go exit door on the Bartlett Boulevard side."

Stanley Anthony testified that he drove to the FedEx store on Bartlett Avenue on the day of the shooting. He said that a small blue car was blocking the entrance, and he pulled around it and into a parking spot. He noticed that a young African-American man was underneath the hood of the vehicle with a Caucasian man standing beside him. Mr. Anthony walked inside the store, and as he completed his transaction, he heard gunfire. He walked over to the window and saw an African-America man pointing a handgun toward Applebee's. Mr. Anthony backed away from the window but remained in the store. He testified, "I remained in the FedEx office because at that time a female/Hispanic comes in the store and says that he got my car. He took my car. He took my car. She was a little hysterical about it." Mr. Anthony then saw "a little white car pass by in front of the door, make a right and head south on Bartlett Boulevard." He did not see the driver's face but noted that there was one person in the vehicle.

Detective Justine Bynum of the Bartlett Police Department responded to the scene of the shooting and spoke with Mr. Crotwell, who was already in an ambulance to be transported to the hospital. Detective Bynum testified that a BOLO ("be on the lookout") had been issued for Ms. Carmona's stolen white Toyota Solara. Detective Bynum spoke with witnesses and gathered information, including an address obtained from Mr. Crotwell's text messages, which led her to develop Defendant as a suspect in the shooting and theft of the vehicle. Using the picture from Defendant's driver's license, Detective Bynum prepared a photographic lineup of six photographs and showed it to Mr. Crotwell, Ms. Carmona, and Ms. Stewart. Both Mr. Crotwell and Ms. Stewart identified Defendant as the perpetrator of the offenses. Detective Bynum noted that the photograph of Defendant included in the lineup did not depict the tear drop tattoo that was on his face at the time of the offenses. After the witnesses identified Defendant, Detective Bynum was informed that Defendant's attorney had contacted the police department to advise them that Defendant would turn himself in, which Defendant did at 4:15 p.m. that same day.

Detective Bynum testified that she located two spent shell casings and one bullet from the crime scene. The blue Chevrolet Cavalier was towed from the scene and later processed for evidence. No fingerprints of value were lifted from the vehicle. Kent Baucum, a building service and staff support employee for the Bartlett Police Department, testified that he moved the Cavalier from the garage after it was processed. He had no difficulty starting the vehicle before he moved it. Defendant's uncle later picked up the Cavalier.

Detective Bynum testified that she returned to the Applebee's parking lot the day after the shooting because Mr. Holloway had reported that his rental truck, which was parked in the parking lot on the day of the shooting, had been struck by a bullet. Detective Bynum found a bullet on the ground near the space where Mr. Holloway had been parked. As part of her investigation, Detective Bynum also obtained surveillance videos from the Kroger gas station and the FedEx building. A search warrant was executed at the home of Defendant's uncle, and the hat the Defendant was wearing at the time of the shooting, the title and key to the Cavalier, and Defendant's wallet were recovered.

Detective Bynum testified that Ms. Carmona's Toyota Solara was found sometime in March 2017 behind a convenience store on Millbranch Road. She processed the vehicle for evidence. Again, no fingerprints of value were lifted from the vehicle. Detective Bynum recovered a bullet from one of the bullet holes in the passenger-side door.

Based on this evidence, the jury convicted Defendant of reckless endangerment, aggravated robbery, two counts of aggravated assault, and one count of assault. The jury acquitted Defendant of employing a firearm during the commission of a dangerous felony. The trial court imposed concurrent sentences, as a Range I offender, of ten years for aggravated robbery to be served at eighty-five percent by operation of law, four years for each of the two counts of aggravated assault, and eleven months and twenty-nine days for assault to be served consecutively to a sentence of eleven months and twenty-nine days for reckless endangerment. It is from these judgments that Defendant now appeals.

## Analysis

### I.        Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for aggravated robbery because there was no direct evidence to prove that he stole Ms. Carmona's car. He further argues that he lacked "the necessary mens rea of intentional or knowingly." The State asserts that based on the testimony of the three victims and the one bystander who saw a single person driving away from the scene in Ms. Carmona's vehicle,

- 8 -

there was ample evidence to support the jury's factual determination that Defendant stole the car at gunpoint.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2014). An aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

Here, the evidence viewed in a light most favorable to the State showed that Defendant became agitated when Mr. Crotwell told him that "all sales are final" on the blue Cavalier, and Mr. Crotwell attempted to leave with Ms. Carmona and Ms. Stewart in Ms. Carmona's Toyota Solara. Defendant then pointed a gun at Ms. Carmona and Ms. Stewart and ordered them out of the Solara, and he instructed Ms. Carmona to leave the keys in the ignition. Mr. Crotwell got back out of the car, and Defendant shot at Mr. Crotwell's feet when he refused to return the money that Defendant had paid him for the Cavalier. Mr. Crotwell ran toward Applebee's, and Defendant shot him in the back of his shoulder as he ran away. Ms. Stewart also ran to Applebee's, and Ms. Carmona ran to a nearby FedEx store. While Defendant argues that no one specifically, saw Defendant take the Solara, Mr. Anthony was in the FedEx store when Ms. Carmona ran in and exclaimed "he took my car." Mr. Anthony also heard gunshots and saw an African-American man pointing a handgun towards Applebee's. He then saw small white car pass by the FedEx store with one person in the vehicle. Ms. Carmona's Solara was later found abandoned behind a convenience store. Ms. Carmona testified that Defendant did not have permission to take her vehicle.

From this evidence, we conclude that a rational juror could infer that Defendant committed the offense of aggravated robbery by knowingly and intentionally taking Ms. Carmona's Toyota Solara at gunpoint, after shooting Mr. Crotwell, and driving the vehicle from the scene, where it was later found abandoned behind a convenience store. Defendant is not entitled to relief on this issue.

## II.    *Batson* **Challenge**

Defendant argues that the trial court erred in granting the State's *Batson* challenge and denying his peremptory challenge to strike Juror 7. The State counters that trial court properly found that there was a pattern of discriminatory strikes of Caucasian jurors by Defendant, that Defendant's race-neutral reason for striking Juror 7 was "pretextual for purposeful racial discrimination," and that the trial court properly granted the State's *Batson* challenge.

In accordance with the Equal Protection Clause of the Fourteenth Amendment, neither party may exercise a peremptory challenge to remove a prospective juror solely on the basis of the juror's race. *Batson v. Kentucky,* 476 U.S. 79, 89-90 (1986); *see also Georgia v. McCollum,* 505 U.S. 42, 59 (1992); *State v. Spratt*, 31 S.W. 3d 587, 596 (Tenn. Crim. App. 2000) (the prosecutor may lodge, on the basis of race, a "reverse *Batson*" objection to a defendant's peremptory challenge of jurors). In *Batson,* the United States Supreme Court established a three-step process for evaluating alleged discrimination during jury selection. First, the party objecting to the peremptory challenge must establish a prima facie case of purposeful discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson,* 476 U.S. at 93-94; *see*

*also Johnson v. California,* 545 U.S. 162, 169 (2005). Next, if the trial court determines that a prima facie showing of purposeful discrimination has been made, the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the challenge. *Batson,* 476 U.S. at 97-98. The race-neutral explanation does not need to be persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 765, 768 (1995). Unless purposeful discrimination is inherent in the explanation, the reason offered will be deemed race-neutral. *See id.* Finally, if the proponent of the challenge provides a race-neutral explanation, the trial court must then determine, from all the circumstances, if the explanation is a pretext and whether the opponent of the peremptory challenge established purposeful discrimination. *See Batson,* 476 U.S. at 98; *see also Miller-El v. Dretke,* 545 U.S. 231, 239 (2005). If the trial court determines that the proffered reason is merely pretextual and that a racial motive is behind the peremptory challenge, the juror may not be excluded. *See State v. Hugueley,* 185 S.W.3d 356, 369 (Tenn. 2006); *Woodson v. Porter Brown Limestone Co., Inc.,* 916 S.W.2d 896, 903 (Tenn. 1996).

When determining whether a *Batson* violation occurred, the trial court must articulate specific reasons for each of its findings on the record. *Woodson* , 916 S.W.2d at 906. The trial court should explain whether a prima facie showing of purposeful discrimination has been established, whether a neutral explanation has been given, and "whether the totality of the circumstances support a finding of purposeful discrimination." *Id.* The trial court's findings are to be accorded great deference and not set aside unless clearly erroneous. *Id.; State v. Smith,* 893 S.W.2d 908, 914 (Tenn. 1994). "[T]he exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992).

In this case, the trial court determined that there was a discriminatory pattern of juror strikes by Defendant and that the State had established a prima facie case of purposeful discrimination by Defendant in striking Juror 7. In the first seven rounds of jury selection, Defendant excused five Caucasian jurors, including Juror 7, leaving none on the venire. "[A] prima facia case of purposeful discrimination may be established solely on evidence relating to the exercise of peremptory challenges so long as the evidence gives rise to an inference of discriminatory purpose." *State v. Torrez Talley, et al.*, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *9 (Tenn. Crim. App., at Jackson, Oct. 16, 2006), *perm. app. denied* (Tenn. Mar. 19, 2007). "While a pattern of strikes against a particular racial group is not required to prove discrimination, it certainly is significant because it may give rise to the inference of discrimination." *Id*.

Next, Defendant offered a race-neutral explanation for striking Juror 7, namely that the juror was a farm equipment mechanic and that the juror's wife worked with warranties issued for farm equipment. Defendant further asserted that Juror 7 was not attentive or responsive to Defendant's questions. Defense counsel did not explain how Juror 7's work as a mechanic was problematic other than to say that "I don't think that [Juror 7] would be

a favorable jury to the defense and the theories that we're going to argue. And based on that I have in conjunction with my client asked to have him excused."

The State countered that Juror 7 was very attentive and responsive to defense counsel's questions and had in fact raised his hand and laughed at defense counsel's jokes. The State further pointed out that every other Caucasian juror that had been excluded by Defendant had been paying attention as well. The State argued that an all African-American jury was not representative of the community and that other African-American jurors, who had better reasons than Juror 7 to be excused, were still on the jury. In particular, the State noted that one African-American juror whose son had been murdered was not challenged by Defendant.

The trial court considered all of the circumstances in this case and rejected Defendant's race-neutral explanation for striking Juror 7. The trial court agreed with the State that Juror 7 had "enjoyed [defense counsel's] humor" and "responded just as well as the other jurors to that." *See, e.g., Miller-El*, 545 U.S. at 241 (if the proffered reason for striking a juror applies just as well to an otherwise-similar juror of a different race who was not excluded, "that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step"). The trial court further said: "I just don't see a reason that [Juror 7] needs to be excused other than maybe the Defendant wants him excused because he's white. I just can't see that he was not attentive." The trial court noted that it was the court's opinion and understanding that trial counsel was "working with her client that he may very well want an all African-American jury. And he's giving input into this." The trial court ultimately concluded that "there is not a racially neutral reason for [Defendant] to want to get rid of [Juror 7] that I can see at this point."

We conclude that the trial court did not err in its application of *Batson*. While Defendant offered a race-neutral reason for striking Juror 7, "the trial court after observing firsthand the demeanor of the defense attorneys and prospective jurors, the racial composition of the venire, and the circumstances involved in peremptory challenges, determined that purposeful discrimination occurred." *Torrez Talley, et al.*, 2006 WL 2947435, at *9. Although *Batson* provides the party objecting to the *Batson* challenge to give a reason for striking a juror, "it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 241. Accordingly, we find that there was no "clear indication that the trial court erroneously applied *Batson*" to deny Defendant's challenge to Juror 7. *Torrez Talley, et al.*, 2006 WL 2947435, at *9. Defendant is not entitled to relief on this issue.

**CONCLUSION**

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____

JILL BARTEE AYERS, JUDGE